IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GIRLIS HUGH SERRATT,  )
#179785,  )
 )
      Plaintiff,  )
 )
v.  )      CASE NO. 2:20-CV-625-RAH-CSC
 )
REOSHA BUTLER, et al.,  )
 )
      Defendants.  )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.    INTRODUCTION

Plaintiff Girlis Hugh Serratt filed this *pro se* 42 U.S.C. § 1983 action. *See* Docs. 1, 4. Thereafter, Plaintiff filed an Amended Complaint, which became the operative pleading in this action. Doc. 7. The Amended Complaint names Ventress Correctional Facility Warden Reosha Butler, Easterling Correctional Facility Warden John Crow, former Alabama Department of Corrections ("ADOC") Commissioner Jefferson Dunn[1], Associate ADOC Commissioner Cheryl Price[2], and Wexford Health Administrator Celeste Hunter as defendants. *Id*. at 1, 2. It alleges that, in June 2020, inmates who tested positive for COVID-19 were transferred from Easterling to Ventress, where Plaintiff is and was confined. *Id*. at 2, 3. Although Plaintiff does not allege that he contracted COVID-19 at the time this action

---

[1] John Hamm has replaced Jefferson Dunn as Commissioner of the Alabama Department of Corrections. Thus, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Hamm is automatically substituted as defendant in his official capacity. Former ADOC Commissioner Jefferson Dunn remains a defendant in his individual capacity. The Clerk is DIRECTED to update the docket sheet and caption accordingly.

[2] Misspelled in the Amended Complaint and on the docket as "Sherry Price."

was filed, he claims "the transfer of the deadly disease to [his] camp was unreasonable[] and made Ventress a ver[]y unsafe place." *Id*. at 8. Based on these allegations, Plaintiff purports to bring an Eighth Amendment deliberate indifference claim and Fourteenth Amendment equal protection claim[3] against Defendants. As relief, he seeks monetary damages; for the Court to "tell Warden Butler to be more cairfull [sic] next time[] and call the (C.D.C.) if anyone try's [sic] to put a virus in her camp"; and for the Court to tell Warden Crow "not to release any inmate for transfer that has a serious disease or virus that can cause harm[] or death to another."[4] *Id*. at 6.

On September 23, 2020, the Court issued an Order directing Defendants to file a Special Report addressing Plaintiff's claims (Doc. 8), which Defendants did on October 19, 2020 (Doc. 25) and December 14, 2020 (Doc. 36).[5] In their Reports, Defendants move for summary judgment or dismissal and provide evidentiary materials in support. *See* Doc. 25 at 12; Doc. 36. Defendants also filed supplements to their Reports as well as responses to Plaintiff's motion for a preliminary injunction with additional evidentiary materials. Docs. 16, 30, 31, 33. On December 15, 2020, the Court issued another Order directing Plaintiff to file a response to Defendants' Reports and other filings with affidavits or

---

[3] Throughout the Amended Complaint, Plaintiff maintains that his Eighth and Fourteenth Amendment rights have been violated by Defendants' conduct. *See generally* Doc. 7. He also states that the Fourteenth Amendment "gives [him] the rights to the equal protection of the law." *Id*. at 8. Thus, the Court will treat Plaintiff's *pro se* pleading liberally and, in an abundance of caution, construe it as attempting to state a Fourteenth Amendment equal protection claim in addition to an Eighth Amendment deliberate indifference claim.

[4] Plaintiff also sought a preliminary injunction "for the state to send all the COVID-19 patients back to the camp they came from, an[d] not bring any more to Ventress." Doc. 7 at 5. However, Plaintiff's motion for a preliminary injunction was denied prior to this Recommendation. *See* Docs. 35, 42.

[5] Defendant Celeste Hunter filed a separate Special Report from the other Defendants.

statements made under penalty of perjury and other evidentiary materials. Doc. 37. The Court received Plaintiff's response on January 13, 2021. Doc. 41. In its December 15 Order, the Court notified the parties that, absent any objections, it may thereafter treat Defendants' Reports, as supplemented, and Plaintiff's response as motions for summary judgment and a response. Doc. 37 at 3. No objections were filed. Thus, the undersigned will now construe the Special Reports as motions for summary judgment and, for the reasons set forth below, RECOMMEND that judgment be GRANTED in favor of Defendants on all claims.

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248). "An issue is 'material' if it might affect the outcome of the case under the governing law." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of

3

'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B).

If the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—

including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)–(3).

"In reviewing whether the nonmoving party has met its burden, the [C]ourt must stop short of weighing the evidence and making credibility determinations of the truth of the matter." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998–99 (11th Cir. 1992) (citation omitted). "Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 999 (citations and internal quotations omitted). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

## III.  RELEVANT FACTS[6]

The following facts derive from Plaintiff's verified Amended Complaint (Doc. 7); the sworn or verified evidentiary materials proffered by Defendants (Docs. 16-1 through

---

[6] The "facts" set forth herein are merely for purposes of resolving summary judgment and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) ("[W]hat we state as 'facts' … for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.").

16-2; 25-1; 30-1 through 30-5; 31-1 through 31-3; 33-1 through 33-2); and Plaintiff's verified declaration in response (Doc. 41-1).

As noted above, the Amended Complaint provides that, in June 2020, inmates who tested positive for COVID-19 were transferred from Easterling to Ventress, where Plaintiff is and was confined. Doc. 7 at 2, 3. He claims that "the transfer of the deadly disease to [his] camp was unreasonable[] and made Ventress a ver[]y unsafe place." *Id*. at 8. He makes the following allegations as to each of the five individual Defendants.

As to Warden Butler, Plaintiff states:

Warden Butler has every sence she came here at Ventress has done all she could to make this a safe prison. She has got the inmate on inmate violents way down, she has also done everything in her power's to treat everyone equal no matter who you are. With this said I have doubts about her OKing the COVID-19 patient's in her camp. But for some reason [she] did with an indifference to an unreasonable risk of a serious harm[] or death to me . . . .

Warden Butler should have called the Center for Disease Control and Prevention, and they would have made them take them back[] to their camp, and this is were she showed her negligence in her duty to keep me safe[] and protect me from an unreasonable risk of serious harm or death from COVID-19 due to the exposure of this disease . . . . [sic]

*Id*. at 7.

As to Warden John Crow, Plaintiff states:

The Warden at Eastling [] knew she/he was transfering positive COVID-19 patints to Ventress [], which was COVID-19 free[.] This transfer violated my constitutional Amend. 8, fore it has and did put me in an unreasonable risk of serious harm[] or death. This, she/he has created a verry unsafe condition for me to live in. [sic]

*Id*. at 4.

As to former Commissioner Dunn, Plaintiff states:

[Commissioner] Dunn has knowenly and willfully violated my constitutional rights under the 8th an 14th Amendments . . . through his willfull negligence of the trasfer of the positived tested COVID-19 patients from Easterling [] to a COVID-19 free camp, Ventress[.] He did not take any reasonable care in which is a part of his duty to protect and keep me safe at the best of his abillity, not to deliberately spread a deadly disease to Ventress [] where I am at. This he has not taken any reasonable care in his duty . . . fore he should have detained the deadly disease where it was, not spread it across the state prison's[.] Thus[,] he has showed no concern for human life. [sic]

*Id*. at 8.

As to Associate Commissioner Cheryl Price, Plaintiff states:

Assistant Prison Commissioner[] Price did under color of law violate my 8th Amendment right . . . fore [sic] she knew the coronavirus is a serious disease that has caused a great harm and death throughout the world, and is a serious disease that has caused a massacre throughout the United States. [She] is the one that signs for any and all inmate transfers in the Alabama D.O.C. She is over the transfer section, and if the transfer papers were signed it was done under the color of law, and this shows a deliberate indifference to my life, and safety, from an unreasonable risk of COVID-19 that should have been under quarantine at Easterling where they were tested positive at.

*Id*. at 10.

Finally, as to Celeste Hunter, Plaintiff states:

Celeste Hunter . . . has violated my 8th Amendment under a deliberate indifference of my heath, for they have denied me access to mental health, for mental stress, and temperature check's[.]

[] I am in H-Dorm and we have had inmate's that has tested possitive for COVID-19. The first day we were put on lockdown we could not get medical to come to the dorm and check our temperture. This act just added to my mental and psychological stress I was all ready having.

I fell off of my top rack and broke my tose on my left foot on the 13th day of Sep. 2020, and today is the _____ day of Sep. 2020, and I have not been seen by medical. It hurts to walk to the dining hall. [sic]

*Id*. at 4.

He further states more generally:

> Ventress . . . is so overcrowded that [inmates] sleep less than four feet apart, and the temperature in the day get's from 98° to 102° in the dorm, and when I go to eat I have to sit shoulder to shoulder with other inmate's in the dining hall, and this alone makes Ventress . . . an incubator for growing bacteria[] and disease's.

> [] This camp was not set up to keep the COVID-19 patients that were sent here, they were put were ever they could put them, and now it is in my dorm now and I have been under a lot of stress[.] [sic]

*Id*. at 9. There is no evidence that Plaintiff contracted COVID-19 at the time he filed this action, but he claims that his dorm has been "under lock down as quarantine," that he "ha[s] been under a lot of stress mentaly and psychologicaly," and that his fear of getting sick "caused [him] not to be able to eat and keep [his food] down." *Id*. at 9.

In response, Defendants concede that six inmates who tested positive for COVID-19 were transferred from Easterling to Ventress in or around July 2020. Docs. 16-1 at 2; 25-1 at 2; 31-2 at 2. However, they aver that these inmates were housed under medical quarantine in a specific, designated location that facilitated medical isolation; the inmates' movements were restricted to prevent them from coming into contact with other inmates; and prison officials have taken, and continue to take, extensive actions to protect inmates and staff from the spread of COVID-19 at Ventress and throughout all ADOC facilities. Docs. 16-1 at 3; 25-1 at 3; 31-1 at 1–16; 31-2 at 2–5.

In response to the COVID-19 pandemic, the United States Centers for Disease Control and Prevention ("CDC") issued an "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." Docs. 30-4 at 2; 33-2 at 1. In an effort to prevent or mitigate the introduction and spread of

COVID-19 in these facilities, the CDC recommends that a number of steps be taken, including but not limited to:

> (1) restricting or suspending the transfers of detained persons and to subject any transfers to medical isolation to evaluate if COVID-19 testing is appropriate; (2) quarantining all new inmates for 14 days before they enter into the general population; (3) cleaning and disinfecting surfaces that are frequently touched multiple times per day, including the use of disinfectants effective against the virus; (4) providing detainees, at no cost, with soap, running water, and hand drying machines or paper towels; (5) implementing social distancing strategies to increase the physical space between each detained person; and (6) medically isolating confirmed or suspected COVID-19 cases.

*Archilla v. Witte*, No. 4:20-CV-596, 2020 WL 2513648, at *3 (N.D. Ala. May 15, 2020). The CDC's Guidance is subject to adaptation for specific institutional settings "based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Docs. 30-4 at 2; 33-2 at 2 (emphasis omitted).

Defendants maintain that they follow the CDC's guidelines, from both a medical and security perspective, and contend that they have taken numerous steps to combat the spread of COVID-19 through ADOC facilities. Docs. 30-1 at 9; 31 at 6–12. Specifically, they provide evidence of the following:

> From the outset of the pandemic in March 2020, ADOC worked to create and implement a plan to respond to the COVID-19 pandemic, both system wide and at Ventress. [Docs. 31-1 at ¶ 7; 31-2 at ¶ 5]. ADOC focused its efforts on operational preparedness, education, increased cleaning and disinfection of facilities, screening, restriction of movement into facilities, and securing and distributing hygiene, cleaning, and medical supplies. [*Id*.]. Additionally, ADOC created specific local teams identified as Pandemic Planning Teams at a facility level to implement protective measures to mitigate inmate and staff exposure to the virus. [Doc. 31-1 at ¶ 7].
>
> [] Beginning in early March 2020, recognizing the threat of COVID-19, ADOC developed a plan of action to combat the spread of COVID-19 and to

protect the inmates and staff. As part of ADOC's efforts to reduce the spread of COVID-19, it initiated an education and communication strategy directed to both staff and inmates. [Docs. 31-1 at ¶ 8; 31-2 at ¶ 5]. These communications consisted of documents and information developed by ADOC's Office of Health Services ("OHS") and the CDC. (*Id.*). The materials provide basic information on COVID-19, such as what it is, how it spreads, and the common symptoms. (*Id.*). Additionally, the documents describe the best methods for protecting oneself and how to help prevent the spread of the virus. (*Id.*). These measures include proper hygiene practices, identifying the signs and symptoms of COVID-19, social distancing, and identifying methods for addressing stress associated with the virus. (*Id.*).

[] In addition to educating staff and inmates, ADOC has taken a number of proactive steps to curb the spread of COVID-19. ADOC, consistent with CDC Guidance, temporarily suspended new intakes[7] and modified the intake process. [Docs. 31-1 at ¶ 9; 31-2 at ¶ 5]. Additionally, ADOC suspended all outside visitors from entering any facility, and implemented a screening procedure prior [to] transferring inmates between ADOC facilities. [Docs. 31-1 at ¶ 9; 31-2 at ¶ 5].

For staff, ADOC implemented a pre-work screening procedure and a process for employees who call-in sick. [Docs. 31-1 at ¶ 10; 31-2 at ¶ 5]. Prior to entering the facility, officers must answer a series of questions and have their temperature checked. (*Id.*). If an officer calls in with an illness, the officer must respond to specific screening questions, and each facility must maintain a log to track all illness related absences. [Doc. 31-1 at ¶ 10].

To provide for a clean environment, ADOC resourced and provided to all facilities, including Ventress, cleaning supplies with instructions for cleaning the facilities and a specific checklist for cleaning kitchens. [Docs. 31-1 at ¶ 11; 31-2 at ¶ 5]. ADOC acquired and distributed facemasks for officers and inmates. [Docs. 31-1 at ¶ 12; 31-2 at ¶¶ 5, 7, 8]. The facemasks to inmates included instructions for care and cleaning of the masks, and a written acknowledgment form signed by the inmate acknowledging receipt or refusal of the masks. [Docs. 31-1 at ¶ 12; 31-2 at ¶ 5].

[] In addition to specific movement restrictions, education, and staffing restrictions, ADOC created and implemented protocols for testing inmates suspected of being COVID-19 positive, and quarantining and medically

---

[7] ADOC temporarily halted new intakes on March 20, 2020 for a minimum of 30 days to allow it to create an intake procedure that will allow for a 14 day quarantine to help prevent infected inmates from being introduced into the population. [Doc. 31-1 at ¶¶ 9, 14, 15, 18.]

isolating inmates directly exposed to or testing positive for COVID-19. Decisions on whether to test an inmate rests with medical personnel based upon criteria developed by ADOC from CDC Guidance, and in coordination with the three (3) level quarantine protocol.

Quarantine and testing occurs based on a three (3) tiered system. [Doc. 31-1 at ¶ 18]. Level one, also known as "watchful wait," requires inmates suspected of exposure to a COVID-19 positive person to be isolated from the general population and monitored for fever and other symptoms of COVID-19. Level one does not require testing. (*Id*.). Level two requires an inmate who exhibits signs or symptoms of COVID-19 or has confirmed prolonged direct exposure to a person who has tested positive to be isolated and tested for COVID-19. (*Id*.). Level three requires medical quarantine for any inmate who tests positive for COVID-19. (*Id*.).

In an effort to provide medical care and operate in a reasonable and efficient manner, ADOC established a medical quarantine area at Ventress to accommodate several facilities. [Docs. 31-2 at ¶ 5; 31-3 at 3]. Inmates, including [those] from Easterling [], have been and will be transferred to Ventress for medical quarantine. [Docs. 31-2 at ¶ 4; 26-1 at 2–3]. The location within the Ventress grounds allowed ADOC to maintain separation of the COVID-19 positive inmates from the general population, and provide necessary medical care for infected inmates. [Docs. 31-2 at ¶ 4; 26-1 at 4–9]. Inmates in the medical quarantine area must remain in the specific location. [Doc. 31-2 at ¶ 4]. ADOC provides all necessary services, including meals and medical care, to the inmates within the medical quarantine area. [*Id*.]. No other inmates, including Plaintiff, have or ever had access to medical quarantine area or inmates within the quarantine area. (*Id*.).

[] While ADOC's administration and OHS have worked tirelessly to curb the spread of COVID-19 system-wide, Warden Butler and Ventress staff engaged in the fight on the frontlines. [Doc. 31-2 at ¶ 5]. Warden Butler, supported by [ADOC Associate Commissioner for Health Services Ruth] Naglich, stated that she and her staff have conducted or overseen the following preventative actions and measures at Ventress:

a. educating inmates and staff through oral and written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

b. encouraging inmates and staff to engage in proper hygiene practices and social distancing;

c.  providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing;[]

d.  continuing medical appointments such as chronic care clinics and sick-call appointments;

e.  suspending copays for inmates seeking medical services;

f.  implementing intensified cleaning and disinfecting procedures;

g.  suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility;

h.  performing verbal screening and temperature checks for all persons entering the facility and, if a person has a temperature over 100.4 degrees Fahrenheit or other symptoms of COVID-19, denying the person entry into the facility;

i.  implementing social distancing strategies;

j.  providing masks to each inmate (and a replacement if these initial masks are misplaced or destroyed), along with instructions on wearing, cleaning, and caring for the masks;

k.  providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

l.  implementing a quarantine or medical isolation plan for any inmate or staff who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19;

m.  monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and

n.  testing inmates for COVID-19 with symptoms of COVID-19 or contact with a person testing positive for or suspected of having COVID-19. []

To provide a clean environment, Warden Butler established a cleaning schedule that requires all surfaces, including bathrooms and living areas, to

be cleaned and sanitized at least two (2) times per shift, for a total of six (6) cleanings per day. [Doc. 31-2 at ¶ 6]. In addition, Warden Butler implemented social distancing measures at Ventress, suspending congregational services, prohibiting religious and educational personnel from entering the facility, and requiring inmates to maintain at least six (6) feet distance while standing in line for meals, phones, or any other matter. (*Id*. at ¶¶ 7, 8). These efforts are on top of the system-wide restrictions that began in March 2020, suspending all outside work in the community, and all visitation. [*Id*. at ¶ 6].

ADOC Official[s'] tireless efforts continue to keep the spread of COVID-19 contained at Ventress. As of November 17, 2020, only seventeen (17) inmates have tested positive for COVID-19 since March 2020, and no COVID-19 positive inmate cases remained. [Doc. 31-3 at 3]. Additionally, twenty-four (24) officers have tested positive since the beginning of the pandemic, and only one (1) staff member remained under self-quarantine as of November 16, 2020. [Doc. 31-2 at ¶ 8].

Doc. 31 at 6–12.

Defendant Hunter further avers that Plaintiff's necessary medical needs have not been delayed or denied at any time. Doc. 30-1 at 3. She testifies that, from January 2020 through September 2020, Plaintiff "did not seek any medical care and/or attention" and did not visit the Health Care Unit at Ventress. *Id*. at 2. On September 13, 2020, Plaintiff completed a Sick Call Request stating that he had fallen out of his bunk and broken his toes on his left foot. *Id*. On September 23, 2020, Plaintiff was seen by a medical provider who examined Plaintiff and diagnosed him with "a contusion of the left foot." *Id*. That same day, he was also provided with a cane, a bottom bunk profile, and a prescription for Doxycycline and Motrin. *Id*. An x-ray was also ordered on September 23, and the x-ray was completed in October 2020. *Id*. Plaintiff did not request any further medical treatment. *Id*. at 3.

Defendant Hunter further testifies that:

13

Inmates are tested for COVID-19 for three separate reasons[:]

a. Symptoms such as fever, headache, congestion, shortness of breath, cough, loss of taste or smell, or GI symptoms. The medical provider makes the decision to test these patients.

b. Patients who are scheduled to go for an off-site appointment or procedure are tested at the request of the off-site provider.

c. Patients are tested when the decision is made from the OHS to conduct mass testing.

Patients who test positive for COVID-19 are placed in medical isolation. The area of medical isolation is determined by ADOC. Single cells are used until they are filled to capacity. Once that happens arrangements are made for the positive patients to be held in an area separate from other inmates. Again, this area is determined by the ADOC.

Patients who test positive for COVID-19 are screened daily for worsening of symptoms and treated accordingly. This is accomplished by nursing and medical provider assessment. Treatment is based on symptoms and can include medications such as OTC medications (Tylenol, Guiafenesin), or antibiotics, inhalers, as indicated.

If the patient's symptoms cannot be managed on-site, they are sent to the free world ER for evaluation and treatment.

*Id*. at 3–4; *see also* Doc. 31-3 at 2–3. Plaintiff was never diagnosed with COVID-19. *Id*. at 9; Doc. 31-3 at 2. Additionally, mental health services at Ventress were never suspended, and any inmate that requested mental health treatment or were referred for such treatment were seen by mental health staff. Doc. 31-2 at 5; *see also* Doc. 7-1.

Finally, in response to Defendants' filings, Plaintiff filed a verified declaration in which he testifies that: (1) Warden Butler tried to keep the COVID-positive inmates from Easterling out of Ventress, but was "overroad"; (2) the transfer of the COVID-positive inmates would not have occurred if they had "a medical hold on them"; (3) the transfer of

the COVID-positive inmates was not the "the best way to prevent the spread of COVID-19"; (4) although the ADOC did some things to prevent the spread of COVID-19, it "could not do the social distancing"; (5) the COVID-positive inmates were transferred to "spread the crisis of COVID-19 throughout the prisons, so we can get money from the federal government through a fraud to receive a stimulus check"; and (6) at one point, Plaintiff was subjected to prolonged exposure to other inmates that tested positive for COVID-19 and experienced some symptoms of the virus but was not tested because he did not run a fever. Doc. 41-1 at 2–8.

He further reiterates that, on September 13, 2020, he submitted a Sick Call Request for his injured foot. *Id*. at 3. However, he claims that:

> I could not get to medical, even after showing the medical providers my foot; it was very swollen. I could not walk on it, and I could not get in my top bunk so I had to do without food, and I had to sleep on the floor. I told the medical personnel, and the officers, and they all told me that they were restricted to emergencies only[.]

*Id*. He claims the reason his medical care was delayed was because of "the order that was set down by Wexford Health Source on May 1, 2020." *Id*. at 4; *see also* Doc. 7-1. The letter Plaintiff references, signed on May 1, 2020 and executed by Defendant Hunter, states in relevant part:

> Due to recent circumstances . . . the Ventress Medical Unit will be restricted to emergencies only, effective immediately until further notice. The medical unit will continue to address all emergencies including, but not limited to, chest pain, sudden and/or severe pain, elevated temperature, symptoms of infection, overdoses, uncontrolled bleeding, COVID related complaints, and any other issues emergent in nature. We will not be able to continue routine sick calls, walk ups, chronic care, or any other routine visits until further notice.[]

Triage during this time is essential and should be happening meticulously and methodically, as is always the expectation. If you need to see a patient, please notify security and have them brought up as usual.[]

It is recommended that mental health staff, that routinely see patients in the medical unit, be provided a secondary location to see patients until further notice, with the exception of anyone who needs to be seen in the medical unit due to housing. Hopefully, mental health staff can temporarily be relocated to the front of the facility.

Doc. 7-1. This policy terminated on June 16, 2020. Docs. 30-1 at 3; 30-2.

## IV.   DISCUSSION

### a.   Plaintiff has failed to establish a genuine issue of material fact as to an Eighth Amendment deliberate indifference claim.

Prison officials have a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). A prison official may be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828.

To survive summary judgment on a conditions of confinement claim, a plaintiff must satisfy both an objective and subjective inquiry. *See id*. at 834; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to demonstrate an Eighth

Amendment violation). Under the objective component, the plaintiff must demonstrate "a substantial risk of serious harm." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) (citation omitted). In *Swain v. Junior*, the Eleventh Circuit acknowledged "that the risk of COVID-19 satisfies this requirement." 961 F.3d 1276, 1285 (11th Cir. 2020). Under the subjective component, the plaintiff must prove "the defendants' deliberate indifference" to that risk of harm by making three sub-showings: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id*. (citation omitted).

Defendants appear to acknowledge "subjective knowledge" of the risk posed by COVID-19. *See, e.g.,* Doc. 31 at 19 ("ADOC Officials recognized the danger created by COVID-19.").Therefore, Plaintiff's claim hinges on whether any Defendant disregarded that risk by conduct that is more than mere negligence. *See Swain*, 961 F.3d at 1285; *Helling v. McKinney*, 509 U.S. 25, 35–36 (1993) (holding that a plaintiff may state an Eighth Amendment claim against prison officials based upon conditions that "pose an unreasonable risk of serious damage to his future health" if he shows "he himself is being exposed" to that potential health risk and that "prison authorities are ignoring the possible dangers posed by exposure"). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id*.

In *Swain*, the Eleventh Circuit addressed the deliberate indifference standard as it applies to the management of COVID-19 in a prison setting. The Court stated:

[E]ven while the district court seemed to assume a state of affairs in which the defendants had taken numerous measures to combat the virus, it held that the defendants were nonetheless deliberately indifferent based on two considerations: (1) the increase in the rate of infections . . . and (2) the lack—and seeming impossibility—of meaningful social distancing at the facility. In so concluding, the district court erred. Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839–40 . . . (quotation omitted).

First, and most obviously, the district court erred in relying on the increased rate of infection. On this point, the Supreme Court's decision in *Farmer* couldn't be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted.*" *Id*. at 844 . . . (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303 . . . (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[] upon its effect upon the prisoner"); *Wilson v. Williams*, [961 F.3d 829, 842–43 (6th Cir. 2020)] (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").

Second, and separately, the district court erred in concluding that the defendants' inability to ensure adequate social distancing constituted deliberate indifference. The court stated no less than eight times in its order that adequate social distancing was "not possible" or "impossible." [] [However,] [f]ailing to do the "impossible" doesn't evince indifference, let alone deliberate indifference.

961 F.3d at 1287. Upon finding that failure to stop the spread of COVID-19 and failure to

adequately social distance does not amount to deliberate indifference, the Court then turned

to the measures taken by the defendants to mitigate the spread of the virus:

[T]he [court-commissioned expert] report observed that the defendants put "tape on the floor to encourage social distancing in lines," that "bunks are staggered with head to foot configuration" in order to maximize the distance between faces during sleep, and that "[p]atients are staggered and appropriately distanced when going to medical." Importantly, we think, while the report noted some social-distancing violations, it concluded that

[the facility's] administrators and employees were "doing their best balancing social distancing and regulation applicable to the facility," and that they "should be commended for their commitment to protect the staff and the inmates." It's worth noting, though not determinative, that the CDC's guidance—on which the district court relied heavily—presupposes that some modification of its social-distancing recommendations will be necessary in institutional settings. The guidance states in bold-face type, on the very first page, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Regarding social distancing specifically, it says that while there should "ideally" be six feet between inmates, "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." It therefore offers "strategies with varying levels of intensity," such as—importantly here, because the defendants claimed to have done so—"[a]rrang[ing] bunks so that individuals sleep head to foot to increase the distance between them."

Moreover, the defendants have represented that they took numerous *other* measures—besides social distancing—to mitigate the spread of the virus. The district court summarized a few of them:

- "requiring staff and inmates to wear face masks at all times (other than when sleeping)";
- "conducting screening for all staff entering the facility";
- "conducting daily temperature screenings for all inmates";
- "suspending all outside visitation"; and
- "providing disinfecting and hygiene supplies to all inmates."

[] The court assumed, for the sake of its deliberate-indifference analysis, at least, that the defendants had implemented these measures, but nonetheless concluded, as a matter of law, that they must have been inadequate because (1) the rate of infections rose and (2) social distancing—which it took to be the most critical measure—wasn't possible.[]

*Id*. at 1288–89 (citations to the record omitted). Finally, the Court held:

Whatever deliberate indifference is, the defendants' conduct here doesn't show it. The district court erred in holding that the defendants acted with a deliberately indifferent mental state, equivalent to "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839–40 . . . . We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by "doing their best." Because the defendants

"act[ed] reasonably," they "cannot be found liable" under the Eighth Amendment.

*Id*. at 1289.

Like in *Swain*, the undersigned finds that Defendants' conduct in this case does not rise to the level of deliberate indifference. Defendants have provided substantial evidence detailing the numerous steps prison authorities have taken to mitigate the spread of COVID-19 throughout the prison system and, specifically, at Ventress. Without repeating each of those steps, which are provided in detail above, Defendants have demonstrated that they have taken significant measures to implement precautions to protect Plaintiff and other inmates from the virus as recommended by the CDC, including—but certainly not limited to—restricting the six inmates transferred from Easterling to medical quarantine in a designated area isolated from other inmates. *See* Docs. 25-1; 31-1; 31-2 at 2–4.

Plaintiff has largely failed to refute Defendants' evidence with anything more than broad, conclusory assertions that Defendants acted unreasonably by the mere act of transferring COVID-positive inmates from Easterling to Ventress. *See generally* Doc. 7; *see also Ellis*, 432 F.3d at 1326 ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."). The Court cannot find, based on the evidence, that the mere transfer of COVID-positive inmates—particularly in light of the many precautions taken with regard to such transfer—constitutes deliberate indifference. At no time does it appear that any Defendant disregarded or ignored the risk of the virus to Plaintiff or other inmates.

Although Plaintiff testifies that the transfer of the COVID-positive inmates was not the "the best way to prevent the spread of COVID-19" and the ADOC "could not do the social distancing" recommended by the CDC, such claims also fail to establish deliberate indifference. As noted above, the Eleventh Circuit has specifically emphasized that one is not deliberately indifferent simply because his or her conduct is ultimately ineffective at preventing the spread of COVID-19. *See Swain*, 961 F.3d at 1287. Nor is one deliberately indifferent by failing to do the impossible, such as maintaining perfect social distancing in a confined space like a correctional facility. *Id*. Moreover, although Plaintiff further testifies that the COVID-positive inmates were transferred to "spread the crisis of COVID-19 throughout the prisons, so we can get money from the federal government through a fraud to receive a stimulus check," this wholly unsupported allegation is far too vague and conclusory to overcome summary judgment. *See Ellis*, 432 F.3d at 1326; *see also Owens v. Sec'y of Fla. Dep't of Corr.*, 812 F. App'x 861, 870 (11th Cir. 2020) (citing *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("[The Eleventh Circuit] has consistently held that conclusory allegations without specific supporting facts have no probative value.")).

The Court is acutely cognizant of the serious nature of COVID-19, particularly at the time this action was filed, when the virus was still novel to and rampant throughout the United States. The Court further empathizes with Plaintiff's wish for conditions, such as social distancing, more conducive to mitigating the spread of the virus throughout the prison system. However, there is simply nothing in the record to suggest that Defendants acted less than reasonably given the limitations with which they were faced. Like the

Eleventh Circuit in *Swain*, this Court "simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.'" *Swain*, 961 F.3d at 1289.

Additionally, Plaintiff has failed to establish a genuine issue of material fact as to his claim that Defendant Hunter denied him medical care or was responsible for his denied medical care. In his Amended Complaint, Plaintiff vaguely alleges that Defendant Hunter denied him "access to mental health[] for mental stress" and that, on one particular occasion, he "could not get medical to come to the dorm and check [his] temper[a]ture." Doc. 7 at 4. He further claims that he "broke [his] tose [sic] on [his] left foot" and was not seen by "medical" for several days. *Id*. In his declaration, he reiterates that he was not seen by "medical" for at least 9 days, even after showing his foot to "the medical providers," due to "the order that was set down by Wexford Health Source on May 1, 2020." Doc. 41-1 at 3–4. He also claims he was exposed to other inmates that tested positive for COVID-19 and experienced some symptoms of the virus but was not tested because he did not run a fever. *Id*. at 7–8.

As to his first allegation, that he was denied access to mental health treatment, he fails to provide any further detail such as when he may have sought treatment, from whom, or how or why such treatment was denied. Furthermore, the undisputed evidence demonstrates that (1) Plaintiff did not seek mental health treatment from at least January 2020 through September 2020 (Doc. 30-1 at 2); and (2) mental health services remained available to inmates, including Plaintiff, at Ventress during the pandemic (Doc. 31-2 at 5;

*see also* Doc. 7-1). Accordingly, Plaintiff fails to overcome summary judgment on this claim.

As to his allegations that "medical" would not come to the dorm to check his temperature on one occasion and that he was not tested for COVID-19 on another occasion because he did not run a fever, he fails to identify any specific individual from whom he sought medical care on those occasions—much less that he sought care from Defendant Hunter—or provide any allegations or evidence to demonstrate that Defendant Hunter was responsible for such conduct. Indeed, it is well-established in the Eleventh Circuit that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (citation omitted). Absent any evidence of Defendant Hunter's direct participation in the unconstitutional conduct or a causal connection between her actions and the alleged constitutional violation, Plaintiff again fails to overcome summary judgment on this claim.

Finally, as to his allegation that he was denied medical treatment for his injured foot by "medical" and "medical providers," he again fails to identify any specific individual who was aware of his condition, who knew the condition posed a substantial risk of serious harm to him, and who failed to respond reasonably. Having failed to proffer any evidence that any particular individual was deliberately indifferent to a serious medical need, there can be no policy-based liability or supervisory liability on the part of Defendant Hunter. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the

departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *see also Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (holding claim for supervisory liability failed where there was no underlying constitutional violation).[8]

Accordingly, because Plaintiff has failed to make a showing of deliberate indifference by any Defendant, Defendants are entitled to summary judgment on Plaintiff's purported Eighth Amendment deliberate indifference claims.

### b.   Plaintiff has failed to establish a genuine issue of material fact as to a Fourteenth Amendment equal protection claim.

Finally, construing Plaintiff's *pro se* pleading liberally, it appears he also purports to bring a Fourteenth Amendment equal protection claim based on Defendants' conduct in transferring COVID-positive inmates to Ventress. To the extent Plaintiff intends to establish such a claim, he has wholly failed to do so. To overcome summary judgment on an equal protection claim, Plaintiff must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on race, religion, national origin, or some other constitutionally protected basis. *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001). Plaintiff has done neither. He has neither alleged nor provided any evidence of the existence of any similarly situated prisoners who received more favorable treatment than him or that he was somehow discriminated against based on a constitutionally protected basis. Accordingly, Defendants

---

[8] Moreover, to the extent Plaintiff believes he was denied medical care based on the May 1, 2020 letter executed by Defendant Hunter, the Court notes that the letter specifically states that the Health Care Unit "will continue to address all emergencies including, but not limited to, . . . sudden and/or severe pain" (Doc. 7-1) and, regardless, the policy set forth therein was terminated on June 16, 2020 (Doc. 30-2).

are entitled to summary judgment on Plaintiff's purported Fourteenth Amendment equal protection claims.

## V.  CONCLUSION

Based on the foregoing, the undersigned RECOMMENDS that:

1.     Defendants' Special Reports (Docs. 25, 36), which the Court construes as motions for summary judgment, be GRANTED;

2.     Judgment be ENTERED in favor of Defendants; and

3.     This case be DISMISSED with prejudice.

It is further ORDERED that, on or before **August 14, 2023**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will not be considered. The parties are advised that this Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 31st day of July, 2023.


/s/ Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE